**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DEENA INDIVIGLIO, individually and on behalf of all others similarly situated,<br><br>                      Plaintiff,<br><br>   v.<br><br>REGAL CINEMAS, INC.,<br><br>                    Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Deena Indiviglio, brings this action on behalf of herself, and all others similarly situated against Regal Cinemas, Inc ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    Defendant Regal Cinemas, Inc. ("Regal") is a cinema chain that develops, owns, and operates the website, regmovies.com, where consumers can watch movie trailers and purchase tickets to movie screenings at various Regal movie theater locations throughout the United States. Yet at Regal, when the cinema lights dim and the films begin, the spotlight is not on the movie, but *on the consumer*.

2.    Regal has installed the Meta Tracking Pixel on its website to secretly and surreptitiously send consumers' personally identifiable information ("PII") to Meta. Every time a consumer watches a movie trailer or purchases a movie ticket on Regal's website, the Meta Tracking Pixel tells Meta exactly who watched what, when, and where. Whenever a consumer watches a movie trailer or purchases a ticket to a movie screening on Regal's website, Regal discloses the title of the movie watched, the buttons the consumers clicked, and the consumer's personally identifiable information to Meta Platforms, Inc. ("Meta" or "Facebook"). Because

Regal collects and discloses all this and other sensitive data about consumers without their written consent, Regal violated the Video Privacy Protection Act ("VPPA").

3.      As Congress has recognized, "films are the intellectual vitamins that fuel the growth of individual thought." S. Rep. No. 100-599, at 7 (Oct. 21, 1988) (citing Senate Judiciary Subcommittee on Technology and the Law, Hearing Tr. at 10 (Aug. 3, 1988)).  Indeed, the videos people watch can often reveal their private politics, religious views, or sexuality—in other words, their most personal and intimate details.  *Id.*  In enacting the VPPA, Congress decided that this intimate information "should be protected from the disruptive intrusion of a roving eye." *Id.*

4.      The VPPA was meant to give consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers."  S. Rep. No. 100-599, at 8.  "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent."  *Id.*

5.      Regal violated the VPPA by knowingly disclosing this sensitive data – including the specific movie tickets Plaintiff and Class Members purchased and the movie trailers they viewed – to unrelated third parties without their consent.  Regal installed the "Meta Tracking Pixel" on its website to track and record Plaintiff and Class Members' private movie ticket purchasing activity and movie trailer viewing activity, and disclosed it to Meta without Plaintiff and Class Members' consent.  Meta, in turn, used Plaintiff and Class Members' video consumption habits to build profiles on consumers and deliver targeted advertisements to them.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different from Defendant.  Defendant sold at least 100,000 tickets

2

to movie screenings taking place in the state of New York through its website during the applicable class period, and is liable for a minimum of fifty dollars in statutory damages for each ticket sold.

7.     This Court has personal jurisdiction over Defendant because Defendant operates dozens of theatres in the state of New York and sells tickets to movie screenings taking place in New York through its website. The Court also has personal jurisdiction over Defendant because it collects sensitive information from New York consumers, including their video consumption habits and geolocation data, so that it can deliver targeted advertisements in New York to these New York consumers.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this District and purchased tickets to see a movie at a cinema in this District.

## PARTIES

9.     Plaintiff Deena Indiviglio is an individual consumer who, at all times material hereto, was a citizen and resident of New Rochelle, New York.  Plaintiff purchased several ticket to see movies at a cinema operated by Defendant and watched dozens of movie trailers through Defendant's website, https://www.regmovies.com.  Plaintiff is not a Regal Crown Club member and purchased her tickets as a "Guest" on Defendant's website.

10.     Defendant Regal Cinemas, Inc. is a corporation with its principal place of business in Knoxville, Tennessee.  Defendant operates brick and mortar cinemas throughout the United States, including dozens in the state of New York.

## RELEVANT FACTUAL ALLEGATIONS

### A.     The VPPA

11.     The origins of the VPPA begin with President Ronald Reagan's nomination of

Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that history.  With an eye toward the digital future, Congress responded by passing the VPPA.  As Senator Paul Simon explained:

> [A]s we continue to move ahead, we must protect time honored values that are so central to this society, particularly our right to privacy.  The advent of the computer means not only that we can be more efficient than ever before, but that we have the ability to be more intrusive than ever before.  Every day Americans are forced to provide to businesses and others personal information without having any control over where that information goes.  Those records are a window into our loves, likes, and dislikes.

S. Rep. 100-599, at 7-8 (internal ellipses and brackets omitted).

12.    The VPPA prohibits "[a] video tape service provider [from] knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

13.    As Senator Patrick Leahy explained while introducing the VPPA, legislators were particularly concerned with consumers' video transactional data being shared with unauthorized third parties:

> The trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance.  These 'information pools' create privacy interests that directly affect the ability of people to express their opinions, to join in association with others and to enjoy the freedom and independence that the Constitution was established to safeguard.  The bill prohibits video stores from disclosing "personally identifiable information"— information that links the customer or patron to particular

> materials or services. In the event of an unauthorized disclosure,
> an individual may bring a civil action for damages.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

14.     The Senate Report further notes that "[t]he term 'video tape service provider' means any person engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, of delivery of prerecoreded video cassette tapes or similar audio visual materials, such as … open-reel movies." *See* S. Rep. 100-599, at 12.  As such, the VPPA's reach does not simply extend to video rental stores like Blockbuster, but to any other  business that even remotely dabbles in video delivery, such as the "department store," the "golf shop," the "Star Trek" "continuity club," S. Rep. 100-599, at 12-13, or in this case, the cinema chain that sells movie tickets and shows movie trailers through its website.

15.     The Senate Report for the bill further clarifies "that personally identifiable information is intended to be transaction-oriented.  It is information that identifies a particular person as having engaged in a specific transaction with a video tape service provider."  S. Rep. 100-599, at 12.

16.     By 2012, Congress had recognized that "the VHS cassette tape–is now obsolete. In its place, the Internet has revolutionized the way that American consumers rent and watch movie." S. REP. 112-258, 2.  As such, it amended to VPPA to clarify that the law's privacy protections also extend to "Internet streaming services." *Id*. at 2. The bill amended the VPPA's informed written consent exception to give consumers control, whether and to what extent, they wish to "share their movie or television preferences through social media sites," by "require[ing] that consumers 'opt-in' to the sharing of their video viewing information" to companies "like Facebook and Twitter."  *Id*. at 3.

**B.**    **Defendant is a Video Tape Service Provider**

17.    Just like "department store[s]," "golf shop[s]," and "continuity club[s]," Defendant is a video tape service provider. See S. Rep. 100-599, at 12-13.

18.    The VPPA defines a video tape service provider as "any person, engaged in the business ... of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Congress expressly included "open-reel movies" as a type of "similar audio-visual material" covered by the VPPA. See S. Rep. 100-599, at 12. Defendant is thus a video tape service provider because it delivers open-reel movies and other pre-recorded video formats to its brick-and-mortar silver screens and delivers hundreds of different movie trailers on its website.  As Regal itself notes, it is committed to being "The Best Place to Watch a Movie!"[1]

19.    Defendant owns and operates Regal Cinemas, which is a movie theater chain that features independent and foreign films in throughout the United States. Defendant also operates regmovies.com (the "Website"), a website where movie-goers can purchase tickets, watch movie trailers, and learn about what is in theaters.

**C.**    **The Meta Tracking Pixel**

20.    Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[2]  Facebook describes itself as a "real identity platform,"[3] meaning users are allowed only one account and must share "the name they go by in everyday life."[4]  To that

---

[1] About, REGAL, https://www.regmovies.com/about (last accessed Dec. 9, 2024).
[2] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html.
[3] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[4] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

end, when creating an account, users must provide their first and last name, along with their birthday and gender.[5]

21.    Meta owns facebook.com, and generates revenue by selling advertising space on that website, and other applications it owns, like Instagram.[6]

22.    Meta sells advertising space by highlighting its ability to target users.[7] Meta can target users so effectively because it surveils user activity both on and ***off its site***.[8] This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[9] Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

23.    Advertisers can also build "Custom Audiences."[11] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[13] Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta. They can do so through two mechanisms: by manually uploading contact information for

---

[5] FACEBOOK, SIGN UP, https://www.facebook.com/.
[6] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.
[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.
[8] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.
[10] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.
[11] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[12] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.
[13] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[14]  One such Business Tool is the Meta Tracking Pixel.

24.    The Meta Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[15]  When the Meta Tracking Pixel captures an action, it sends a record to Meta.  Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

25.    Advertisers control what actions – or, as Meta calls it, "events" – the Meta Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[16]  Advertisers can also configure the Meta Tracking Pixel to track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[17]  An advertiser can also create their own tracking parameters by building a "custom event."[18]

26.    Advertisers control how the Facebook Tracking Pixel identifies visitors.  The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[19]  HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[20]  Pixel-specific Data includes "the Pixel ID and cookie."[21]

---

[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[15] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.
[16] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED,
https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.
[17] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[18] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142.
[19] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.
[20] Id.
[21] Id.

### D.    Regal's Website and Its Use of the Meta Pixel

27.    Regal is a cinema chain that offers a website where consumers can watch movie trailers and purchase tickets to movie screenings.

28.    Defendant installed the Meta Tracking Pixel to track consumers' video consumption habits while on Regal's website.  Defendant collects two separate events which permits ordinary people to identify the specific video material or service a consumers requests or obtained: "PageView," and "Button Click."  The "PageView" event discloses to Meta the name of the URL of the Regal webpage, which includes the title of the movie which a consumer is either purchasing a ticket to see, or clicking play to watch a movie trailer of.  The Button Click Audomatically Detected event, on the other hand, discloses to Meta the text of any button a consumer clicks (like "Watch," Book Seats," "Next," and "Complete Order") along with the title of the movie the consumer is seeking to watch, book seats for, and checkout, and purchase tickets to see.

29.    For example, if a consumer navigates to Regal's page for the Christmas action/comedy film *Red One*, the PageView events discloses to Meta the URL of page, which contains the title of the movie.

**Figure 1**



**Figure 2**



30.     If a consumer clicks the "Watch" button on this page to watch the *Red One* movie trailer, a new "Button Click" event instantaneously sends to Meta the text of the button the consumer clicked, the title of the movie (Red One), and the URL of the webpage, which also contains the title of the movie. A movie trailer then begins playing.

**Figure 3**



**Figure 4**



**Figure 5**



31.     The Meta Tracking Pixel continues to track Button Click events as a consumer proceeds through the movie ticket purchasing process.  After the consumer selects a theater, date, and time, they are taken to a seat selection page.

**Figure 6**



32.     If a consumer clicks the "Book Seats" button on this page, another Button Click event is disclosed to Meta.

**Figure 7**



33.     After clicking the Book Seats button, consumers can select the number and type of tickets they wish to purchase and click "Next."

**Figure 8**



34.     Once a consumer clicks the "Next" button, another event is disclosed to Meta.

**Figure 9**



35.     Thereafter, consumers are taken to a payment screen, where they can input their

credit card information.

**Figure 10**



36.     Once a consumer clicks the Complete Order button, the consumer has purchased

the tickets to a particular movie screening and another Button Click event is disclosed to Meta.

37.     But Regal does not simply disclose that any generic consumer purchased a ticket

to see *Red One* or watched the movie trailer. Instead, if that consumer visits Regal's website on

the same web browser she used to log into Facebook, then Regal also compels the consumer's

browser to transmit an identifying "computer cookie" to Meta called "c_user" for every single

PageView or Button Click event disclosed to Meta.  The c_user cookie contains that consumer's

unencrypted Facebook ID.  Figures 11 through 13, next page, show a copy of the c_user cookie

being transmitted to facebook.com when a consumer clicks the complete order button, as shown

on the webpage by accessing developer tools by clicking the F12 button on a keyboard.

14

**Figure 11**



**Figure 12**



**Figure 13**



38.   The c_user cookie is personally identifiable information because it contains a consumer's unencrypted Facebook ID.  A Facebook ID allows *anybody*—not just Facebook—to identify the individual consumer.  Specifically, if one types www.facebook.com/[FacebookID]

16

into a web browser, it will load that individual's Facebook page.  For example, the c_user cookie in Figures 3-5 above is 1528550551, and www.facebook.com/1528550551 leads to the counsel of record's Facebook page.

39.    The Meta Tracking Pixel transmits additional cookies to Meta.

40.    The "fr" cookie contains, at least, an encrypted Facebook ID and browser identifier.[22]  Facebook, at a minimum, uses the fr cookie to identify particular users.[23]

41.    Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  Facebook uses this for targeted advertising.

42.    The Meta Tracking Pixel uses both first and third-party cookies.  A first-party cookie is "created by the website the user is visiting" – *i.e.*, Regal.[24]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting" – *i.e.*, Facebook.[25]

43.    Meta, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

44.    A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile – and all personal information publicly listed on that profile – by appending the Facebook ID to the end of https://facebook.com/.

45.    Through the Meta Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Meta to know, among other things, that a given consumer purchased a ticket to a particular movie at a particular Regal cinema location or watched a particular movie trailer.[26]

---

[22] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[23] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[24] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[25] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

[26] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

46.     Regal begins to collect this information through tracking pixels when a user first chooses a movie to purchase tickets for on regmovies.com.

47.     Defendant discloses these identifiers so Meta can match them with a corresponding Facebook profile and link it to a consumer's subsequent activity on Regal's website.  By compelling a visitor's browser to disclose the c_user and fr cookies alongside event data, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's movie viewing behavior.

48.     Meta confirms that it matches activity on Regal with a user's profile.  Meta allows users to download its "off-site activity," which is a "summary of activity that businesses and organizations share with [it] about [consumers'] interactions, such as visiting [organizations'] apps or websites."[27]  The off-site activity report confirms Regal identifies an individual's movie viewing activities.

**Figure 14**



49.     As Meta explains, companies like Regal share with Meta information like when a particular Facebook user "added an item to a cart" or "made a purchase." *See* Figure 15, below.

_____

[27] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?, https://www.facebook.com/help/2207256696182627.  As discussed there, the Off-Facebook Activity is only a "summary" and Facebook acknowledges "receiv[ing] more details and activity than what appears in your Facebook activity."  What is more, it omits "information we've received when you're not logged into Facebook, or when we can't confirm that you've previously used Facebook on that device."

The purpose of this undisclosed data sharing is so that Regal "may use [this] customer interation to create a unique group of customers in order to show them relevant ads."

**Figure 15**



**E.    Regal's Failure to Obtain Consent**

50.    While Regal has been disclosing consumers' PII to Meta, it has not properly obtained consumers' informed written consent as required under VPPA.

51.    The VPPA only allows a video tape service provider to disclose PII of a consumer to a third party "with the informed, written consent (including through an electronic means using the Internet) of the consumer that—(i) is in a form distinct and separate from any form setting forth other legal or financial obligations to the consumer."  18 U.S.C. § 2710(B)(i).  The video tape service provider must also "provide[] an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election."  18 U.S.C. § 2710(B)(iii).

52.    Regal failed to meet this informed written consent requirement under the VPPA because at no point did Regal obtain informed, written consent, in a separate and distinct form.

**F.    Experience of Plaintiff**

53.    In the last two years, Plaintiff Deena Indiviglio has frequently visited regmovies.com to view various movie trailers. On November 21, 2024, she also purchased five tickets to watch a movie at one of Regal's brick and mortar cinema in New Rochelle.

54.    Plaintiff has a Facebook page that contains her real name and photo.

55.    When Plaintiff Indiviglio purchased movie tickets and watched movie trailers on Regal's Website, regmovies.com, Defendant disclosed her event data, which recorded and disclosed the movie's title and her button clicks on the webpage.  Alongside this event data, Defendant also disclosed identifiers for Plaintiff Indiviglio including the c_user and fr cookies to Meta.  According to her off-site activity report, regmovies.com had disclosed her event data oto Meta on *at least* 161 occasions.

**Figure 16**

56.     By disclosing her event data and identifiers, Defendant disclosed Plaintiff Indiviglio's personally identifiable information to Meta and Plaintiff's personal information and video purchase record data to Meta.

57.     Plaintiff Indiviglio discovered that Defendant surreptitiously collected and transmitted her personally identifiable information in December 2024.

## CLASS ALLEGATIONS

58.     **Class Definition**: Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who have Facebook accounts and purchased movie tickets and watched movie trailers on regmovies.com (the "United States Class").

59.     Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

60.     **Numerosity (Fed. R. Civ. P. 23(a)(1))**:  At this time, Plaintiff does not know the exact number of members of the aforementioned Class.  However, given the popularity of Defendant's website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

61.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3))**:  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the United States Class and California Class that predominate over questions that may affect individual members of the United States Class and California Class include:

(a)     whether Defendant collected Plaintiff's and the Class's PII;

(b)     whether Defendant unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;

(c)     whether Defendant's disclosures were committed knowingly; and

(d)     whether Defendant disclosed Plaintiff's and the Class's PII without informed written consumer as defined under the VPPA.

62.     **Typicality (Fed. R. Civ. P. 23(a)(3))**:  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, used Regal's website to purchase movie tickets or watch movie trailers, and had her PII collected and disclosed by Defendant without her consent.

63.     **Adequacy (Fed. R. Civ. P. 23(a)(4))**: Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA.  Plaintiff and her counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class.  Neither Plaintiff nor her counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Class.  Plaintiff has raised viable statutory claims or the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant may take.

64.     **Superiority (Fed. R. Civ. P. 23(b)(3))**:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable.  Even if every member of

the Class could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and the court system, and protects the rights of each member of the Class.  Plaintiff anticipates no difficulty in the management of this action as a class action.

<u>**CAUSES OF ACTION**</u>
<u>**COUNT I**</u>
**Violation of the Video Privacy Protection Act**
**18 U.S.C. § 2710, *et seq.***

65.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint

66.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

67.     Defendant is a "video tape service provider" because it is a cinema chain where consumers can purchase tickets to movie screenings at Regal's theater locations across the country and watch movie trailers on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).  In particular, by allowing consumers to purchase a ticket to a movie, Regal is "rent[ing]" consumers access to view "prerecorded … audio visual materials," on its physical premises and is "deliver[ing]" consumers those same prerecorded audio visual materials on its premises by playing them on a

cinema screen. Also, by allowing consumers to watch movie trailers on its website, Regal is also "deliver[ing]" those prerecorded audio visuals to consumers.

68.     Plaintiff is a "consumer" under the VPPA because she is a "renter [or] purchaser… of good or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).  In particular, by paying for a ticket to see a movie in one of Defendant's theaters, Plaintiff rented or purchased a specific service: a movie screening at one of Defendant's theaters.

69.     Defendant disclosed to a third party, Facebook, Plaintiff's and Class members' personally identifiable information.  Defendant utilized the Meta Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like her Facebook ID, along with Plaintiff's event data, like the title of the videos she viewed.

70.     Defendant knowingly disclosed Plaintiff's PII because it used that data to build audiences on Facebook and retarget them for its advertising campaigns.

71.     Plaintiff and United States Class members did not provide Defendant with any form of consent – either written or otherwise – to disclose their PII to third parties.

72.     Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  In particular, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

73.     On behalf of herself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the members of the Class, prays for judgment as follows:

(a)    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)    For compensatory and statutory damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

Dated: March 05, 2025                    **BURSOR & FISHER, P.A**.

                                         By: ___*/s/ Philip L. Fraietta*___
                                                  Philip L. Fraietta

                                         Philip L. Fraietta
                                         1330 Avenue of the Americas, 32nd Floor
                                         New York, NY 10019
                                         Telephone: (646) 837-7150
                                         Facsimile: (212) 989-9163
                                         Email: pfraietta@bursor.com

Stefan Bogdanovich (*pro hac vice app.*
*forthcoming*)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: sbogdanovich@bursor.com

*Attorneys for Plaintiff*